___ FILED ___ ENTERED
___ LODGED ___ RECEIVED

JUL 21 2017

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY_____ DEPUTY

Chief Magistrate Judge James P. Donohue

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LOUIS ONG,<br><br>Defendant. | NO. MJ17-304<br><br>COMPLAINT FOR VIOLATION<br>Title 18, United States Code, Sections 1956(a)(3)(B) and 1960(b)(1)(A) |

BEFORE the Honorable James P. Donohue, Chief United States Magistrate Judge, U. S. Courthouse, Seattle, Washington.

### COUNT 1
### (Money Laundering)

On or about June 12, 2017, in Whatcom County, in the Western District of Washington, LOUIS ONG, with the intent to conceal and disguise the nature, location, source, ownership, and control, of property believed to be the proceeds of specified unlawful activity, that is, $20,000 in United States currency, did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce involving property represented by a law enforcement officer, to be proceeds of specified unlawful activity, and property used to conduct and facilitate specified unlawful activity,

to wit, distribution of controlled substances, in violation of Title 21, United States Code, Section 841(a).

All in violation of Title 18, United States Code, Sections 1956(a)(3)(B) and 2.

## COUNT 2
### (Operating an Unlicensed Money Transmission Business)

Beginning at a time unknown, but not later than December 2016, and continuing until on or about July 21, 2017, in King County, within the Western District of Washington, and elsewhere, LOUIS ONG, knowingly conducted, controlled, managed, supervised, directed, and owned all or part of an unlicensed money transmitting business affecting interstate and foreign commerce, without an appropriate money transmitting license in a State, to wit, the State of Washington, where such operation is punishable as a misdemeanor and a gross misdemeanor under State law.

All in violation of Title 18, United States Code, Sections 1960(b)(1)(A) and 2.

This Complaint is based upon the following information:

I, BRETT A WILLYERD, a Postal Inspector with United States Postal Inspection Service, Seattle, Washington, being first duly sworn on oath, depose and say:

### INTRODUCTION

1. I am a United States Postal Inspector, assigned to investigate the unlawful transportation of contraband through the United States Mail to include violations of Title 21 controlled substances and Title 18 illegal contraband. I have been employed as a Postal Inspector since April 2012 and am currently assigned to the United States Postal Inspection Service (USPIS) Seattle Division Headquarters and as a Task Force Officer with Homeland Security Investigations (HSI), Border Enforcement Security Task Force (BEST), located in Seattle, Washington. As part of my duties, I investigate the illegal use of the United States Postal Service (USPS) to mail and receive controlled substances, the proceeds of drug trafficking, instrumentalities associated with drug trafficking and illegal contraband. I have completed USPIS Basic Inspector Training in Potomac, Maryland. I

COMPLAINT/ONG - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

also have attended a one-week specialized training course presented by USPIS addressing narcotics investigations and current trends in narcotics mailings. I have also received training on the identification of controlled substances, interdiction of controlled substances and proceeds of the sale of controlled substances. I have training and experience investigating websites and associated website activity in the Dark Web, which is the portion of the Internet that is intentionally hidden from search engines, uses masked IP addresses, and is accessible only with a special web browser. I also have training and experience in virtual currency, such as bitcoin, an unregulated digital currency that allows users to engage in online transactions anonymously. As a result, I am familiar with undercover cyber investigations, the use of virtual currency, encrypted communications and electronic evidence collection. I have attended a Homeland Security Investigations Cyber Investigations Training with the emphasis in Tor (a web browser that uses encryption and layered relays to provide anonymity for an internet user and his or her internet activity), Dark Web Marketplaces, and bitcoin. Additionally, I have attended Homeland Security Investigations Virtual Currency Investigations Training.

2. The facts set forth in this Affidavit are based on my own personal knowledge; information obtained from other individuals during my participation in this investigation, including other law enforcement officers; interviews of cooperating witnesses; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.

3. Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of a criminal complaint, it does not set forth each and every fact that I, or others, have learned during the course of this investigation.

## SUMMARY OF PROBABLE CAUSE

4. From December 15, 2016, through July 21, 2017, HSI undercover agent(s) ("UCA") conducted seven transactions with LOUIS ONG in which he provided the UCA with bitcoin in exchange for U.S. currency. Six of these exchanges occurred face-to-face,

while one of the transactions was conducted via the U.S. Mail. All of these transactions were anonymous transactions, i.e., ONG did not require any identification from the relevant UCA before conducting the transactions.

5. On May 10, 2017, ONG was encountered by law enforcement outside of the HSI Blaine office. ONG was observed passing U.S. currency through a currency counter. Upon contact with HSI agents, ONG indicated that he had just conducted a bitcoin-for-cash transaction and had received $45,000 United States Dollars (USD) as payment for the bitcoin. At the end of the consensual interview with HSI, ONG was advised that he was required to register with the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") if he was going to engage in such activities.

6. On May 30, 2017, and June 6, 2017, ONG electronically filed registration documents with FinCEN regarding his money transmitting business. ONG, however, has never registered himself or his business with the State of Washington Department of Financial Institutions ("DFI"), i.e., the appropriate registration authority in Washington State.

7. Despite his registration with FinCEN, on June 12, 2017, July 7, 2017, and July 21, 2017, ONG again conducted face-to-face cash for bitcoin transactions with HSI UCAs posing as drug traffickers. The funds involved in these transactions were represented to be the proceeds of illicit narcotic sales.

8. As the result of ONG's conduct, he has engaged in money laundering, in violation of 18 U.S.C. § 1956, and operating an unlicensed money transmission business, in violation of 18 U.S.C. § 1960.

## STATEMENT OF PROBABLE CAUSE

### A. Background on Bitcoin

9. Digital currency (also known as crypto-currency) is generally defined as an electronically sourced unit of value that can be used as a substitute for fiat currency (*i.e.*, currency created and regulated by a government). Digital currency is not issued by any

government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Digital currency is not illegal in the United States.

10. Bitcoin is a type of digital currency. Bitcoin payments are recorded in a public ledger that is maintained by peer-to-peer verification and is thus not maintained by a single administrator or entity. Bitcoins are widely used to conduct both legitimate and unlawful business. For example, Microsoft accepts bitcoins as payment for Xbox games and services. On the other hand, bitcoins were the payment used on the Silk Road, a website on the dark web that offered drugs and other contraband for sale.

11. Individuals can acquire bitcoins through bitcoin exchanges (*i.e.*, websites that allow individuals to purchase bitcoins for other currency), bitcoin ATMs, or directly from other people. Individuals can also acquire bitcoins by "mining" bitcoins. An individual can mine bitcoins by allowing his/her computing power to verify and record the bitcoin payments into a public ledger. Individuals are rewarded for this task by being given newly created bitcoins.

12. An individual can send and receive bitcoins through peer-to-peer digital transactions or by using a third-party broker. Such transactions can be completed on any type of computer, including laptop computers and smart phones.

13. Even though the public addresses of those engaging in bitcoin transactions are recorded on the public ledger, the true identities of the individuals or entities behind the public addresses are not recorded. If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous.

14. Bitcoins can be stored in digital "wallets." A digital wallet essentially stores the access code that allows an individual to conduct bitcoin transactions on the public ledger. To access bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key"). The public address

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

can be analogized to an account number while the private key is like the password to access that account.

15. Bitcoin exchangers and bitcoin users often store bitcoins in several ways, including desktop, mobile, and online wallets; hardware devices; and paper wallets. The desktop, mobile, and online application wallets are electronic in nature and can be stored on mobile devices (phones or tablets) or accessed through website-based wallets via a computer, tablet, or any device that can search the internet. Bitcoin wallets can also be stored on external hardware wallets or removable media (such as USB thumb drives, Trezor, Ledger, *etc.*). Each electronic bitcoin application wallet (such as Mycelium) can hold several unique alphanumeric character bitcoin wallet addresses that in turn can hold bitcoin. In addition, paper bitcoin wallets contain a bitcoin address and a QR code with the public and private key embedded in the code.[1] Paper wallet keys are not stored digitally. Bitcoin wallets can also be backed up onto paper printouts, USB drives, CDs and accessed through a "seed phrase" (random words strung together in a phrase) or a complex password. Additional security safeguards for bitcoin wallets can include two-feature authorization (such as a password and a phrase).

**B.  The Seattle Undercover Operation**

16. In December 2016, Special Agent (SA) Judson Scott, HSI, BEST, Seattle, responded to an advertisement posted online which advertised the anonymous buying and selling of bitcoin through various means – to include the U.S. Mail and in-person exchange. After an exchange of text messages between the poster of the advertisement – determined by investigation to be LOUIS ONG – and SA Scott, a bitcoin deal was set-up for December 15, 2016.

17. On December 15, 2016, ONG and HSI UCA1 met at a McDonald's restaurant in Tukwila, Washington. ONG arrived at the restaurant in a vehicle registered in his name (hereinafter "Target Vehicle").

---

[1] A "QR code" is a matrix barcode that is a machine-readable optical label.

18. During the meeting at the McDonald's, an HSI UCA exchanged $12,000 USD for bitcoin. Prior to the transfer of bitcoin, ONG used a money counter to verify the amount of currency presented by UCA1. After confirming the amount of U.S. currency tendered by UCA1, ONG, using a silver and white Apple iPhone in a dark case, transmitted bitcoin to a wallet that was designated by UCA1. ONG was told that the wallet belonged to UCA1's boss. In fact, the wallet was maintained by law enforcement.

19. ONG indicated that the service fee for this transaction was 9%. The amount of bitcoin transferred was equivalent to $11,123.83 USD which resulted in an effective service fee of approximately 7.3%. Based upon my training and experience, I know that this is a substantially higher service fee than that charged by legimate, FinCEN-licensed bitcoin exchangers.[2]

20. During the transaction, ONG explained that he was flying to Boston later on in the day. This statement prompted a discussion regarding the risk associated with flying via commercial airline with $12,000 in cash. ONG stated that he had a plan for explaining why he had this amount of cash if questioned by law enforcement at the airport. ONG also explained that he would probably deposit $3,000 in his U.S. bank accounts.

21. After the exchange, agents maintained surveillance of Target Vehicle. Agents observed ONG traveling to three separate banks. ONG first stopped at a Wells Fargo located at 4011 S. 164th St., Seatac, WA 98188. ONG next went to a Bank of America ("BofA") located at 16640 International Blvd., Seatac, WA 98188. Finally, ONG went to a Chase Bank located at 18400 International Blvd., Seatac, WA 98188. Bank records obtained during the investigation indicate that on December 15, 2016, ONG deposited $1,000 into an account under his name at each of these three banks.

---

[2] For example, a service fee of 1.49% is charged by the bitcoin exchanger Coinbase, a service fee of 1% is charged by the exchanger Bitpay, and a service fee of 0.10% - 0.25% is charged by the exchanger Bitstamp.

COMPLAINT/ONG - 7

22. On February 1, 2017, UCA1 again met with ONG for the purpose of exchanging U.S. currency for bitcoin. This meeting occurred at the Northgate Mall in Seattle, Washington. ONG arrived at this meeting driving Target Vehicle. This meeting was audio recorded.

23. Prior to the transaction, UCA1 specifically represented to ONG that the $50,000 USD that were being exchanged for bitcoin were the proceeds from the illicit sale of narcotics. When UCA1 disclosed this fact, ONG explained:

> I don't know anything about that, so, what you just told me, like, went over my head. I didn't hear that. So there is one thing I tell people is I don't really care what, ah, they use the bitcoin for . . . The only thing is, I just like, ah, because for me it's better that I actually don't know. Cause then I can have plausible deniability. Cause at the same time, cash can be used for anything, right? So really, yeah, I just, I didn't hear that.

Despite the representations made by UCA1, ONG continued with, and completed, the transaction.

24. The exchange was conducted in generally the same manner as the first exchange. For this exchange, however, ONG was provided the bitcoin wallet to which the bitcoin were to be transferred via text message from an HSI agent using an undercover phone. ONG indicated that he would charge a commission of 9% for this transaction. The amount of bitcoin transferred was 46.6117 BTC, which was approximately $45,477.26 USD on the date of the transaction. This resulted in an effective service fee of slightly over 9%. In addition to the statements regarding "plausible deniability" ONG also acknowledged that, "I am charging [unintelligible] higher than a lot of people, but, because, ah, I get the job done, people come to me."

25. Immediately after concluding the transaction, ONG addressed the issue of registration as a money remitter both in the State of Washington and Federally:

> ONG: I think you guys trust me because the very first question I asked you when we sat down was are you were law enforcement. Cause technically in Washington State, um, its, the laws are kind of muddled because the Federal law says that, ah, you know, I am considered a user and not a business, an exchange. But, the Washington State law, they put in something that says that what I am doing is,

quote unquote, money transmission, which needs to be licensed. So the Federal says that I don't need to be licensed, and the State says that I do. So it's kind of like, so it's kind of like a gray area right now.

UCA1: Yeah, I guess so.

ONG: And, technically . . .

UCA1: And they don't really [unintelligible] one another.

ONG: Well yeah, they don't. And then, and also too, it's like, I think that, the intention of that law is to prevent businesses from being unlicensed. I'm not, I don't really consider myself a business, this is more of like a hobby. I'm an investor. And if they, like I mean, if somebody sent like, somebody like $2 worth in bitcoin for coffee, is that considered money transmission? Right, like technically in Washington State. . .

UCA1: Right (voice overlaps with ONG's).

ONG: Everything that you send in bitcoin [unintelligible] money transmission.

UCA1: Wow (voice overlaps with ONG's).

ONG: Which is bullshit, really.

UCA1: [unintelligible] a little excessive.

ONG: Yeah, well anyways, it's still a very gray area, and I don't think they are really enforcing it, it just got put into some stupid state statute, or something.

UCA1: Umm-huh. Right (voice overlaps with ONG's).

ONG: But anyways, that's why I kind of like tell people in Washington State that I'm an investor and I'm not a business.

UCA1: Umm-huh.

ONG: I am just a hobbyist, I buy . . . Like I don't hold other people's funds. Like I buy and sell my own personal, which is true, correct. So umm . . .

26. Immediately after this discussion on registration, ONG clarified with UCA1 that UCA1's boss had not told ONG what he does, and had not told ONG anything about Mexico. UCA1 indicated that she will be the "face" with whom ONG deals. ONG then stated that, "I can just say, like, hey, I . . , there is a really nice lady, she's buying bitcoins from me, she's an investor, whatever, right? So as far as I am concerned, you are an investor."

27. After the exchange of United States currency for bitcoin, agents maintained surveillance of ONG and Target Vehicle as he traveled to three separate banks. ONG first stopped at a BofA located at 401 NE Northgate Way, Seattle, WA 98125. Bank records obtained during the course of this investigation do not show a BofA deposit in ONG's name on this date. ONG next went to a Bank of the West located at 1191 2nd St., Seattle, WA 98101. Bank records obtained through the course of this investigation indicate that ONG does not have a bank account at Bank of the West. Finally, ONG travelled to Seattle Metropolitan Credit Union located at 722 3rd Ave., Seattle, WA 98104. ONG does not have an account at this bank either, but law enforcement learned from bank employees that on February 1, 2017, ONG made a deposit of $4,100 into another individual's account.

28. On and around February 16, 2017, I communicated with ONG via an encrypted texting application, Signal, on an undercover mobile phone in order to arrange an exchange of $5,000 USD for bitcoin through the United States Mail. Through the texting exchange, ONG stated, "We are experienced and have sent and received several cash shipments with no problems via USPS thus far." Moreover, ONG described how to package and conceal the United States currency, instructing to "conceal the cash well" and "be creative," but "not too creative. DO NOT use excessive tape or packing material."

29. On February 23, 2017, I again communicated with ONG via the Signal application to complete the exchange of $5,000 USD for bitcoin. I provided ONG the Priority Mail Express tracking number, EK704674316US, and the bitcoin wallet address

in which I wanted the bitcoins deposited. ONG then sent me the address to send the United States currency.

30. On February 24, 2017, ONG sent me a Signal text message which indicated that he had received the parcel and had sent approximately 4.0511 Bitcoins ($4,773.54 USD) to a bitcoin wallet I provided in previous communications. This bitcoin wallet was maintained by USPIS, and not an individual agent. This resulted in an effective service fee of approximately 4.5%.

31. On March 1, 2017, an HSI UCA (UCA2) met with ONG at a Denny's restaurant in Marysville, Washington to exchange $20,000 USD – purported to be from illicit narcotics sales – for bitcoin. As with the previous transaction, ONG was provided the bitcoin wallet to which the bitcoin were to be transferred via text message from an HSI agent using an undercover phone. This wallet was maintained by law enforcement. The amount of bitcoin transferred was 15.0662 BTC, which was approximately $18,351.49 USD on the date of the transaction. This resulted in an effective service fee of approximately 8.24%.

32. After the exchange, ONG entered a Nissan Altima – record checks indicate that this vehicle was registered to Enterprise Car Rental. Agents conducted surveillance of ONG as he drove north in the Nissan Altima to Bellingham, Washington. Agents observed as ONG parked in the Mount Baker Post Office parking lot and sat in the vehicle in the parking lot for several minutes.

33. ONG then entered the post office and was observed by an agent acquiring a USPS envelope, pulling out a magazine from the trash, and exiting the post office. ONG was then observed entering the same Nissan Altima. After about fifteen minutes in his vehicle, agents observed ONG re-enter the post office carrying a USPS envelope. Once inside the post office, I observed ONG place a USPS parcel ("Target Parcel") into the mail stream.

34. After ONG mailed the Target Parcel, he returned to his vehicle and agents maintained surveillance on ONG while he drove north on I-5. When ONG arrived in

Ferndale, Washington,[3] he first went to a Wells Fargo located at 1855 Main St., Suite 101, Ferndale, WA 98243.

35. At Wells Fargo, agents then observed ONG accessing a safe deposit box. Bank records obtained during the course of investigation show that on January 18, 2017, Ong opened safe deposit box #294 at the Wells Fargo in Ferndale, Washington. Bank records also show that Ong made a deposit of $1,000 into his Wells Fargo checking account on this date.

36. ONG next travelled to a Chase Bank located at 1825 Main St., Ferndale, WA 98248. A check of bank records indicate that ONG made a $900 deposit into an account in his name at this bank on March 1, 2017.

37. On March 7, 2017, ONG sent SA Scott – who was acting as the "boss" of the HSI UCAs – a text message regarding the representations made by UCA1 and UCA2 in Paragraphs 23 and 31 above, i.e., that the funds being transferred were from illicit narcotics sales:

> ONG: I have a request. I am not interested in what you buy or sell btc for, so please do not mention it or have your friends mention it either. In both cases your operatives tried to discuss with me what your operations are. Not interested and don't have the time. I am just a private investor who sells btc to other investors. As far as I know you're just an investor. Let's keep it that way.
>
> SA Scott (undercover): Sure. She knows. She said her role was as an investor. Was he out of line? I apologize if so. He's not as discreet as her but she was not available so I had to use someone else.
>
> ONG: Not out of line. Just your friends seem to be a bit open about what you do, when there is really no need to be and it can come off as entrapment. In any case I've had a talk with both so it should all be good now.

---

[3] On March 31, 2017, the Honorable Mary Alice Theiler issued a warrant authorizing the search of Target Parcel. Paragraph 38 of the Affidavit filed in support of that warrant application contained an error in that that the city of "Blaine, Washington" was referenced as the city where Ong made the two cash deposits. The location of the two banks where Ong made cash deposits was actually "Ferndale, Washington."

38. On or about March 31, 2017, the Honorable Mary Alice Theiler, Western District of Washington, issued a warrant authorizing the search of Target Parcel. When this search warrant was executed on April 11, 2017, Target Parcel was found to contain $12,580 USD.

39. On May 10, 2017, HSI SA Steven Buzas noticed Target Vehicle backed into a parking spot outside the HSI office in Blaine, Washington.

40. When HSI SA Robert Baker made contact with the driver of the vehicle, he observed an Asian male – later identified as LOUIS ONG – sitting in the driver's seat of the vehicle. In plain view, SA Baker could see that ONG was passing United States currency through a money counter located in the passenger seat of the vehicle. SA Baker also observed a USPS Priority Mail box with packing material on the dash of the vehicle.

41. SA Baker made contact with ONG and asked him about the money in the vehicle. ONG stated that the money had been mailed to his Post Office Box located at the Blaine, Washington Post Office. ONG indicated that he used this Post Office Box to receive packages related to his bitcoin business.

42. ONG stated that he had received $45,000 in USD from an unknown subject from Arizona. ONG further told SA Baker that he traded bitcoins as an investment. ONG stated that he uses various websites to advertise. ONG stated that this is only the third time that he has received money through the mail. ONG stated that he received $6,500 USD in November 2016 and $7,000 USD in April 2017. ONG did not mention any of the face-to-face transactions with HSI UCAs or the $5,000 that I mailed to him on February 23, 2017. At the end of the consensual interview with HSI, ONG was advised that he was required to register with FinCEN if he was going to engage in such activities.

43. On June 1, 2017, ONG called SA Baker and told him that he had registered with FinCEN as an MSB. Through an inquiry with FinCEN, law enforcement confirmed that as of May 30, 2017, ONG filed registration documents with FinCEN.

COMPLAINT/ONG - 13

44. On June 12, 2017, despite having just filed registration documents with FinCEN, ONG met with two HSI UCAs (UCA3 and UCA4) who were posing as members of SA Scott's drug trafficking organization. The parties met at a Denny's restaurant located in Bellingham, Washington. The purpose of the meet as communicated by SA Scott to ONG was to discuss the use of bitcoin as a means of moving drug proceeds from the U.S. to Mexico and to exchange $20,000 USD for bitcoin. As with the previous transactions, ONG was provided the bitcoin wallet to which the bitcoin were to be transferred via text message from an HSI agent using an undercover phone. ONG charged a 10% commission for this transaction.

45. Regarding the use of bitcoin to transfer money from the U.S. to Mexico, ONG advised UCA3 and UCA4 that:

> A lot of the remittance work that I do, though, it's very important, though, that the people who buy from me are in close coordination and contact with the people that cash them out at the same time. Because you need to lock the rate. Because what happens is, you don't want any – what we call slippage – slippage risk. For example, let's say you buy from me, right? It gets sent to Mexico in, like, two minutes, or whatever, right? And then, let's say you wait until the next day to cash out. What if the price goes down? You lost money. So you need to be able to, ah, you know, lock in a rate with your guy down there, whoever's cashing you out.

46. The parties then exited the Denny's restaurant and proceeded to UCA3's undercover vehicle. As the transaction was being conducted, UCA4 noticed that ONG was using a bitcoin wallet application other than Mycelium. ONG explained that he was using a Green Address bitcoin wallet application to complete the transfer of bitcoins.

47. Toward the end of the transaction, UCA3 asked ONG if he would accept "product" as payment. ONG stated that he would only accept cash when exchanging bitcoin. In response to UCA3's discussion of the drug trade, ONG noted that he only buys and sells bitcoin, and reiterated that he needed to maintain "pd – plausible deniability" regarding the source of funds involved in his bitcoin transactions. At no time during the transaction did ONG ever request any identification from UCA3 or UCA4.

48.     After the completion of the transaction, agents maintained surveillance of ONG as he drove Target Vehicle to a BofA located at 4251 Guide Meridian, Bellingham, WA 98226. ONG remained in the BofA for approximately ten minutes. Agents were not able to observe what – if any – transactions ONG conducted at that time.

49.     After leaving BofA, ONG proceeded in Target Vehicle to the far corner of the parking lot for the Park Bowl located at 4175 Meridian, Bellingham, WA 98229. After ONG had been parked for several minutes, a gold Honda Civic, driven by a white male, parked near ONG. ONG was observed exiting his vehicle and retrieving a bag from the trunk of Target Vehicle. He was then observed entering the front passenger side door of the gold Honda Civic.

50.     Shortly after ONG entered the gold Honda, agents observed a black Toyota Prius park near the gold Honda Civic. The white male in the gold Honda Civic was then observed exiting his vehicle. He approached the driver's side of the black Toyota Prius and retrieved what appeared to be a bag. The white male then returned to the gold Honda Civic. After several more minutes, ONG was observed exiting the gold Honda Civic. ONG was then observed reentering Target Vehicle and driving away from the Park Bowl parking lot.

51.     Agents maintained surveillance of ONG as he drove to a Chase Bank located at 4279 Guide Meridian, Bellingham, WA 98226. Agents observed ONG enter the Chase Bank. Again, agents were not able to observe what – if any – transactions ONG conducted at that time.

52.     On July 7, 2017, ONG again engaged in an anonymous face-to-face bitcoin exchange with an HSI UCA (UCA5) who was posing as a member of SA Scott's drug trafficking organization. This exchange occurred in UCA5's vehicle in a parking lot of the Northgate Mall in Seattle, Washington. ONG arrived at the meeting driving a Dodge Ram 1500 Hemi truck. Record checks indicate that this vehicle was registered to Enterprise Car Rental.

53. The exchange occurred in the vehicle of UCA5 and was video recorded. As with previous transfers of U.S. currency for bitcoin, ONG was provided the address of an HSI undercover bitcoin wallet. For this transaction, UCA5 provided ONG with $9,000 USD. Again, ONG charged a 10% commission for the transaction. At no time during the transaction with UCA5 on July 7, 2017, did ONG ever request any identification from UCA5.

54. On July 21, 2017, ONG again engaged in an anonymous face-to-face bitcoin for cash exchange with HSI UCA1 who was posing as a member of SA Scott's drug trafficking organization. During the meeting, UCA1 provided ONG with $200,000 USD. In exchange, ONG transmitted bitcoins to an undercover digital wallet specified by SA Scott. At no time during the transaction did ONG ever request any identification from UCA1.

## CONCLUSION

Based on the foregoing, I submit that there is probable cause to believe that LOUIS ONG committed the crimes of money laundering and operating an unlicensed money transmission business.

_____
BRETT A. WILLYERD
Postal Inspector, USPIS

Based upon the Complaint and Affidavit, for which the agent provided a sworn statement attesting to the truth of the contents, the Court hereby finds that there is probable cause to believe the Defendant committed the offenses set forth in the Complaint.

Dated this 21st day of July, 2017, at Seattle, Washington.

_____
JAMES P. DONOHUE
Chief United States Magistrate Judge